United States Court of Appeals
Fifth Circuit

**F I L E D**

March 24, 2006

Charles R. Fulbruge III
Clerk

REVISED APRIL 4, 2006

In the
United States Court of Appeals
for the Fifth Circuit

_____

m 05-40370

_____


JUNE BELT,
ON BEHALF OF HERSELF AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED;
PAUL MAIOCCO, WASHINGTON PLAINTIFF;
DONALD CHRISTIAN, NEW YORK PLAINTIFF;
LUCILLE MOYLAN, ILLINOIS PLAINTIFF;
VICTOR AMBROSIA, ILLINOIS PLAINTIFF;
HUNTINGTON YEO;
DARYL WEIN, UCL AND CALIFORNIA PLAINTIFF;
JEANETTE SHELLY, UCL AND CALIFORNIA PLAINTIFF;
RONALD MARTINEZ, UCL AND CALIFORNIA PLAINTIFF;
JULIE JUNG, UCL AND CALIFORNIA PLAINTIFF;
DEBORAH GASKINS, UCL AND CALIFORNIA PLAINTIFF;
DAVID DONA, UCL AND CALIFORNIA PLAINTIFF;
MASON CARLIN, UCL AND CALIFORNIA PLAINTIFF;
SUSAN BERTELSEN, UCL AND CALIFORNIA PLAINTIFF;
NEIL ADLER, UCL AND CALIFORNIA PLAINTIFF;
DEBORAH NICHOLS, ARIZONA PLAINTIFF;
FLSA EMPLOYEES,

Plaintiffs-Appellees,

VERSUS

EMCARE, INC., AND TEXAS EM-I MEDICAL SERVICES, P.A.,

Defendants-Appellants.

Before KING, SMITH, and BENAVIDES,
   Circuit Judges.

JERRY E. SMITH, Circuit Judge:

This appeal presents the question whether physician assistants ("PA's") and nurse practitioners ("NP's")[1] qualify for the professional exemption to the overtime requirements of the Fair Labor Standards Act ("FLSA"). Plaintiffs, and the Department of Labor ("DOL") as *amicus curiae*, contend that the regulation interpreting the professional exemption, 29 C.F.R. § 541.3 (1973), does not speak to the precise question before us and that the agency's informal interpretive statements excluding plaintiffs from the exemption merit deference under *Auer v. Robbins*, 519 U.S. 452 (1997). We agree and affirm, and remand for further proceedings.

## I.

Plaintiffs are 59 PA's and 20 NP's who provide health care services for EmCare, Inc., in hospital emergency rooms in twenty states.[2]

Plaintiffs are paid hourly at a flat rate for all hours worked, including overtime (i.e., all hours over forty in a workweek). The DOL's Bureau of Labor Statistics' Occupational Outlook Handbook provides an overview of the job descriptions of PA's and NP's:

Physician assistants (PAs) practice medicine under the supervision of physicians and surgeons . . . PAs are formally trained to provide diagnostic, therapeutic, and preventive health care services, as delegated by a physician. Working as members of the health care team, they take medical histories, examine and treat patients, order and interpret laboratory tests and x rays, and make diagnoses. They also treat minor injuries, by suturing, splinting, and casting. PAs record progress notes, instruct and counsel patients, and order or carry out therapy. In 48 States and the District of Columbia, physician assistants may prescribe medications. PAs also may have managerial duties. Some order medical supplies or equipment and supervise tech-

---

[1] Although the defendant employers tend to refer to plaintiffs by their official titles, plaintiffs are prone to use the collective term "mid-level providers." Recognizing that the respective choices of terms are strategic, we use the official titles.

[2] Defendant Texas EM-I is a physicians group responsible for adequately staffing hospital emergency rooms. It contracted with EmCare to help
(continued...)

[2](...continued)
perform administrative tasks. EmCare states that it assists Texas EM-I by "providing recruiting, scheduling, malpractice insurance coverage, risk management, and clinician payroll support." We refer to defendants jointly as "EmCare."

nicians and assistants.[3]

Nurse practitioners provide basic preventive health care to patients, and increasingly serve as primary and specialty care providers in mainly medically underserved areas . . . In most States, advanced practice nurses can prescribe medications.[4]

Plaintiffs sued EmCare for back wages and liquidated damages under the FLSA, alleging that EmCare was violating the FLSA by failing to pay time-and-a-half compensation for overtime. EmCare responded that it did not owe plaintiffs additional pay, because they qualify for an exemption as *bona fide* professionals under 29 C.F.R. § 541.3(e) (1973). The parties filed cross-motions for partial summary judgment on this issue, and the district court granted plaintiffs' motion. *See June Belt v. EmCare Inc.*, 351 F. Supp. 2d 625 (E.D. Tex. 2005).

The court reasoned that § 541.3(e) is ambiguous, so it deferred to the DOL's informal pronouncements on § 541.3(e), including a DOL opinion letter and the Wage and Hours Field Operations Handbook, which tended to show that PA's and NP's must be paid on a salary basis to be exempt from the FLSA. The court based its decision on *Auer*, 519 U.S. at 461, which held that an agency's interpretation of its own ambiguous regulation is controlling unless clearly erroneous or inconsistent with the regulation.

The court also considered the history of the FLSA's professional exemption, which showed that the DOL had rejected earlier efforts to expand the exemption to include other professionals, such as engineers and architects, and that the NP and PA professions had not fully developed when the exemption was created. The court further considered the latest version of the applicable regulations, effective August 23, 2004,[5] which codified a previous informal interpretation of § 541.3(e) (i.e., provided notice and comment), requiring that certain analogous professions, such as nurses and certified medical technologists, be salaried to be exempt from the overtime requirements. The court certified its order for interlocutory appeal under 28 U.S.C. § 1292(b),[6] and we granted leave to appeal.

II.

The FLSA provides that a covered employee shall receive compensation at one-and-one-half times the regular rate for every hour

---

[3] *Physician Assistants*, *in* BUREAU OF LABOR STATISTICS, U.S. DEP'T OF LABOR, OCCUPATIONAL OUTLOOK HANDBOOK 2006-07, http://www.bls.gov/oco/ocos081.htm (last visited March 13, 2006).

[4] *Nurse Practitioners*, *in* BUREAU OF LABOR STATISTICS, U.S. DEP'T OF LABOR, OCCUPATIONAL OUTLOOK HANDBOOK 2006-07, http://www.bls.gov/oco/ocos083.htm (last visited March 13, 2006). Plaintiffs and the DOL represent that the duties of PA's and NP's are almost indistinguishable.

[5] Though the district court found the 2004 revisions instructive, the facts underlying this case occurred before the recent amendments took effect. Therefore, this case is governed by the regulations as codified in 1973.

[6] A district court may certify an order for interlocutory appeal under § 1292(b) where the order "involves a controlling question of law as to which there is substantial ground for difference of opinion and . . . an immediate appeal from the order may materially advance the ultimate termination of the litigation."

4

over forty worked during the week,[7] but not if he is "employed in a bona fide executive, administrative, or professional capacity . . . as such terms are defined and delimited from time to time by regulations of the Secretary." 29 U.S.C. § 213(a)(1). Pursuant to this authority, the DOL, after notice and comment, issued § 541.3, which defines a "bona fide . . . professional" as an employee who satisfies certain duty requirements[8] and "is compensated for services on a salary or fee basis" (the "salary-basis test").[9]

Section 541.3(e) further provides that the salary-basis test does not apply to "an employee who is the holder of a valid license or certificate permitting the practice of law or medicine or any of their branches and who is actually engaged in the practice thereof" (the "salary-basis exception"). Because the parties agree that plaintiffs satisfy the duty requirements of the professional exemption and are paid hourly, the sole interpretive issue in this appeal is whether NP's and PA's hold a license permitting, and actually engage in, "the practice of . . . medicine or any of [its] branches."

If NP's and PA's practice medicine within the meaning of § 541.3(e), plaintiffs do not need to satisfy the salary-basis test to qualify for the exemption, and EmCare can deny additional overtime pay. If, however, plaintiffs do not practice medicine under § 541.3(e), they are subject to the salary-basis test, they do not fall within the exemption, and they are eligible for time-and-a-half compensation. We are the first circuit to address the precise issue presented by this case.

III.

When confronted with a statute administered by an executive agency, we defer to the agency's interpretation of the statute if (a) the statute is silent as to the precise question at issue and (b) the agency's interpretation is reasonable.[10] We employ a similar two-step test when interpreting an agency regulation. First, we ask whether the regulation is "ambigu[ous]

---

[7] "[N]o employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1).

[8] The relevant duty provisions require that an employee's (a) "primary duty consist[] of the performance of . . . [w]ork requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study," (b) "work requires the consistent exercise of discretion and judgment in its performance," (c) "work is predominantly intellectual and varied in character," and (d) at least 80 percent of the employee's time must be so occupied. 29 C.F.R. § 541.3 (a)-(d) (1973).

[9] Id. § 541.3(e). Neither side argues that the DOL lacked authority to issue these implementing regulations. An employee is considered paid on a "salary . . . basis" if "under his employment agreement he regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of his compensa-
(continued...)

[9](...continued)
tion." Id. § 541.118(a) (1973).

[10] Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43 (1984).

5

with respect to the specific question considered."[11]

Second, if the regulation is ambiguous, the agency's interpretation (as contained in, e.g., opinion letters) is "controlling unless plainly erroneous or inconsistent with the regulation." *Auer*, 519 U.S. at 461 (articulating the rule in the context of interpreting a different aspect of the salary-basis test) (internal quotations omitted). If the regulation is unambiguous, we may still consider agency interpretation, but only according to its persuasive power.[12]

### A.

EmCare argues that PA's and NP's unambiguously practice medicine or a branch of medicine within the meaning of § 541.3(e), and plaintiffs maintain the regulation does not speak to this precise question. Before addressing the issue on the merits, however, plaintiffs contend it is waived because EmCare raises it for the first time on appeal, having consistently represented to the district court that § 541.3(e) is ambiguous, and having relied instead on the interpretive regulation, 29 C.F.R. § 541.314 (1973), to make its case.

EmCare replies that "an argument is not waived on appeal if the argument on the issue before the district court was sufficient to permit the district court to rule on it."[13] The district court held that "[t]hese regulations do not expressly address whether physician assistants and nurse practitioners are exempted from the salary-basis test, and, on this issue, the regulation is therefore ambiguous." *Belt*, 351 F. Supp. 2d at 627.

We have spoken to this waiver issue:

If a litigant desires to preserve an argument for appeal, the litigant must press and not merely intimate the argument during the proceedings before the district court. If an argument is not raised to such a degree that the district court has an opportunity to rule on it, we will not address it on appeal.

*FDIC v. Mijalis*, 15 F.3d 1314, 1327 (5th Cir. 1994). We have noted, however, that "[n]o bright-line rule exists for determining whether a matter was raised below." *N.Y. Life Ins. Co. v. Brown*, 84 F.3d 137, 142 n.4 (5th Cir. 1996).

EmCare's corporate representative, Mr.

---

[11] *Moore v. Hannon Food Serv.*, 317 F.3d 489, 495 (5th Cir. 2003); *Christensen v. Harris County*, 529 U.S. 576, 588 (2000) (finding *Auer* deference appropriate "only when the language of the regulation is ambiguous").

[12] *Moore*, 317 F.3d at 495; *Christensen*, 529 U.S. at 587 (stating that "interpretations contained in formats such as opinion letters are entitled to respect . . . but only to the extent that those interpretations have the power to persuade.") (internal quotations omitted). The Court described this degree of deference in *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944):

We consider that the rulings, interpretations and opinions of the [agency], while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.

[13] *Lifemark Hosps., Inc. v. Liljeberg Enters.*, 304 F.3d 410, 428 n.29 (5th Cir. 2002).

Wilson, stated under oath that EmCare was relying only on the DOL's interpretive regulation, not § 541.3. EmCare contends, however, that it argued to the district court that the court should not rely on a 1974 DOL opinion letter because plaintiffs "are included within the unambiguous terms of § 541.3 and § 541.314, and that any agency interpretation of those regulations should be given only persuasive deference, if any, under *Skidmore*."

Our review of the record, coupled with the fact that EmCare can provide no specific quotation or any excerpt from any district court filing to support its claim, suggests EmCare did not "press . . . the argument" in the district court. *Mijalis*, 15 F.3d at 1327. Because, however, a finding that § 541.3 is ambiguous was necessary to the district court's ultimate conclusion that it was appropriate to defer to the agency's informal interpretive statements under *Auer*, the issue was sufficiently raised for the court to rule on it, *see Liljeberg*, 304 F.3d at 428 n.29, and is preserved for appeal.

## B.

Plaintiffs claim that regulatory exemptions from the FLSA must be "narrowly construed against the employers seeking to assert them and their application limited to those [employers] plainly and unmistakably within their terms and spirit." *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960). In *Arnold*, however, the Court applied its canon of strict construction against employers in the course of interpreting ambiguous *statutory* language in the former exemption from FLSA overtime requirements for a retail establishment. *See* 29 U.S.C. § 213(a)(2), (4) (1949). Because there was no regulatory interpretation of the relevant provisions of § 213, the Court needed to consider legislative history, past precedent, and canons of construction to reach its result. *See*

*Arnold*, 361 U.S. at 392-94. Here, the current § 213(a)(1) explicitly gives the DOL authority to define and cabin the definition of "bona-fide . . . professional" and hence the scope of the professional exemption. It would be inappropriate to apply a canon of strict (as opposed to fair) construction to the agency's discretionary exercise of its own, lawfully delegated authority.[14]

Therefore, because the regulations do not define the terms used in § 541.3(e), we must consider the words' ordinary meaning.[15] EmCare argues that capacious language does not automatically entail ambiguity and that NP's and PA's unambiguously fall within the broad scope of § 541.3(e). EmCare relies on caselaw, dictionary definitions, and the employment duties of NP's and PA's to make its argument.

First, in *Moore* we considered 29 C.F.R. § 541.118(a)(6), which provides a "window of correction" for employers who make improper deductions from the paychecks of exempt employees under the FLSA. The regulation states that an employee will automatically lose exempt status unless the deduction is made through "inadvertence, or is made for reasons other than lack of work." *Id.* at § 541.118-(a)(6). We reasoned that the relevant deductions in that case, made as a disciplinary pen-

---

[14] *See Auer*, 519 U.S. at 463 ("A rule requiring the Secretary to construe his own regulations narrowly would make little sense, since he is free to write the regulations as broadly as he wishes, subject only to the limits imposed by the statute.").

[15] *See Gore, Inc. v. Espy*, 87 F.3d 767, 773 (5th Cir. 1996) (holding that where the regulations do not provide a definition, "we must first determine whether the Secretary applied the ordinary meaning of that term.").

alty for cash register shortages, were "made for reasons other than lack of work" and therefore could be corrected by the employer. *Moore*, 317 F.3d at 496-98. In the course of reaching our decision, we noted that

> [t]he presence or lack of ambiguity in a regulation should be determined without reference to proposed interpretations; otherwise, a regulation will be considered 'ambiguous' merely because its authors did not have the forethought expressly to contradict any creative contortion that may later be constructed to expand or prune its scope.

*Id.* at 497. EmCare cites this language to support its contention that we should give no weight to agency interpretations that seek to "narrow" the reach of § 541.3(e) to exclude NP's and PA's merely because the regulation does not explicitly mention them.

*Moore* is distinguishable: We held, based on the regulation's language, that "lack of work" exhausted the universe of reasons why an employer could not correct an improper deduction. *Moore*, 317 F.3d at 497 (applying reasoning akin to *expressio unius*). Because disciplinary deductions were not made for "lack of work,"[16] there was no "ambiguity with

respect to the specific question considered." *Id.* at 495. In contrast, § 541.3(e) contains no similarly forthright exclusionary language: Just because a regulation limited to persons "actually engaged in the practice" of medicine "or any of [its] branches" must exclude *someone*, this fact does not make it obvious whether NP's and PA's fall within its scope.[17]

Likewise, in *Christensen* the Court considered a regulation that allowed employers to contractually obligate employees to take mandatory leave to reduce accrued compensatory time.[18] In that case, Harris County implemented a mandatory policy, not in the initial employment agreements, but only after it became apparent that the county could not pay employees for accrued time. Plaintiffs relied on a DOL opinion letter that stated employers could institute this policy only in the text of the agreement itself. *Christensen*, 529 U.S. at 581.

The Court found that the letter was not

---

[16] The Secretary of Labor made no effort in *Moore* to argue that the deductions in question were made for "lack of work." Instead, the Secretary argued, despite the text of the regulation, that *no* employer who engages in a practice of impermissible deductions can cure the problem through the window of correction, except for inadvertence. *See Moore*, 317 F.3d at 493-94 (quoting *Klem v. County of Santa Clara*, 208 F.3d 1085, 1091 (9th Cir. 2000)). In contrast, the instant parties present competing positions on whether NP's and PA's fall within the general regulatory language; i.e., the
(continued...)

[16](...continued)
"branches" of medicine.

[17] *Moore* would be more helpful to EmCare if, for example, § 541.3(e) stated that all employees in medicine or related fields, "other than interns and residents," qualify for the professional exemption. Because NP's and PA's plainly are not interns or residents, they likely would fall within the broad scope of the regulation, even if the agency offered a contrary interpretation.

[18] *See Christensen*, 529 U.S. at 587-88; 29 C.F.R. § 553.23(a)(2) (providing that "the [employment] agreement or understanding may include other provisions governing the preservation, use, or cashing out of compensatory time so long as these provisions are consistent with [the relevant statute]").

controlling because the regulation was unambiguous: It *permitted* employers to include a compelled use clause in an agreement ("*may* include"), but by no means *required* them to do so. *Id.* at 588. Therefore, the Court held that absent an express prohibition, the county could pursue its policy of compulsory leave. *Id.* Because the regulation in *Christensen* was unambiguous, even though it did not discuss every method the county could use to implement its policy, EmCare argues that § 541.3(e) is also unambiguous, even though it fails specifically to discuss whether NP's and PA's fall within its scope.

EmCare's reliance on *Christensen* is misplaced. The regulation there spoke directly to the binary issue posed by the case: Did the agency exclude non-contractual methods of enforcing a compelled leave policy? *Moore* posed a similar yes-or-no question: Did the rule deny the window of correction to any employer that deducted pay for any reason besides lack of work?

It is possible to pose the question in this case in a similar way: Does the regulation exempt from the FLSA anyone who practices medicine or one of its branches? The problem is that one cannot answer this question without addressing the key terminological dispute: whether NP's and PA's practice medicine or a branch of medicine. When the courts in *Moore* and *Christensen* found broad language unambiguous, they were not confronted with the taxonomic difficulties presented here.

EmCare tries to resolve this problem with dictionary definitions; most importantly, that the ordinary meaning of medicine is "the art or science of preserving health and treating disease." RANDOM HOUSE WEBSTER'S DICTIONARY 447 (3d ed. 1998). Using that broad definition and the licensing requirement of § 541.3(e), EmCare formulates its proposed reading of the rule, which is the analytical core of its entire argument, as follows: "[A]ny person who has received formal permission from the relevant authority to practice in the art or science of preserving health and treating disease is included within the Salary Basis Exception." EmCare argues that NP's and PA's unambiguously fall within this definition because they are (1) licensed and (2) act to preserve health and treat disease.[19]

The decision in *Clark v. United Emergency Animal Clinic, Inc.*, 390 F.3d 1124, 1127 (9th Cir. 2004), lends some support to EmCare's position; that court held, when considering the applicability of § 541.3(e) to veterinarians, that "[l]ogically as well as linguistically, veterinary medicine is a 'branch' of medicine." The court used the "ordinary, dictionary meaning of the terms" of the regulation to reinforce its view, *id.*, which is language almost identical to EmCare's proposed formulation: "[A] doctor of veterinary medicine is a practitioner licensed and practicing in the field of medical science and healing on animals, a branch of medicine." *Id.* at 1128.

Nevertheless, *Clark* is inapposite. First, the fact that *Clark* also considered § 541.314, the DOL interpretive regulation, suggests that that court may have believed (or at least assumed *arguendo*) that § 541.3(e) is ambiguous. *See Clark*, 390 F.3d at 1127. Second, and more importantly, plaintiffs argue that the "practice of . . . medicine" is a term of art that should be construed as a single phrase.[20]

---

[19] *See supra* notes 3-4 and accompanying text.

[20] *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. (continued...)

For example, neither NP's nor PA's qualify to "practice medicine" under Texas law.[21] Wilson conceded that, as far as he was aware, NP's and PA's are not licensed to practice medicine within the meaning of any state's medical practices law.[22] EmCare gives no satisfactory answer why this evidence should not count toward finding ambiguity in the regulation, other than to note that the DOL nowhere explicitly adopted any state's definition of medical practice.

Though we routinely consult dictionaries as a principal source of ordinary meaning,[23] we may also look to other statutes dealing with the same subject that use identical, or nearly identical, language, to resolve a difficult interpretive problem.[24] The fact that NP's and PA's are not licensed to practice medicine under any state's medical practices statute is strongly persuasive evidence that these professions do not view "practicing medicine" as part of their job description. It is plausible that the words "or any of [its] branches" in § 541.3(e) are limited to traditional medical fields whose licenses *are* recognized by the states; e.g., osteopath, dentist, chiropractor, or optometrist. *See, e.g.*, TEX. OCC. CODE § 104.003.

Also, it is difficult to draw a limiting principle from EmCare's proposed definition: It would seem that registered nurses are both (1) licensed and (2) practice the art or science of preserving health and treating disease. But, the courts and DOL interpretive regulations have rejected the applicability of the profes-

---

[20](...continued)
355, 372 (1986) (noting that "technical terms of art should be interpreted by reference to the trade or industry to which they apply").

[21] *See, e.g.*, *Weyandt v. State*, 35 S.W.3d 144, 148 (Tex. App.SSHouston [14th Dist.] 2000, no pet.) (affirming jury verdict of guilty for advanced NP practicing medicine without a license); *Bradford v. Alexander*, 886 S.W.2d 394, 397 (Tex. App.SSHouston [1st Dist.] 1994, no pet.) (stating that PA does not practice medicine as contemplated by the former Texas Medical Liability and Insurance Improvement Act).

[22] For example, the Texas Occupancy Code defines "practicing medicine" more strictly as "the diagnosis, treatment, or offer to treat a mental or physical disease or disorder or a physical deformity or injury by any system or method, or the attempt to effect cures of those conditions, by a person who (A) publicly professes to be a physician or surgeon; or (B) directly or indirectly charges money or other compensation for those services." TEX. OCC. CODE § 151.002. The Code lists neither PA's nor NP's as licensed to practice the healing arts. *See id.* § 104.003.

[23] *United States v. Orellana*, 405 F.3d 360, 365 (continued...)

[23](...continued)
(5th Cir. 2005) (quoting *Thompson v. Goetzmann*, 337 F.3d 489, 497 n.20 (5th Cir. 2003)).

[24] *See Preferred Physicians Mut. Risk Retention Group v. Pataki*, 85 F.3d 913, 917-18 (2d Cir. 1996) (interpreting the word "discriminate" by reference to ordinary meaning and its use in other statutes); *Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*, 171 F.3d 818, 823 (3rd Cir. 1999) (noting the rule and citing 2B NORMAN J. SINGER, SUTHERLAND ON STATUTORY CONSTRUCTION §§ 51.01, 51.02, 51.03 (5th ed. 1992)); *United States v. Gibson Specialty Co.*, 507 F.2d 446, 450 (9th Cir. 1974) (noting that the word "facilitate" was held to have its ordinary meaning in the context of the statute at issue and other statutes).

sional exemption to registered nurses.[25] This evidence does not suggest that § 541.3(e) unambiguously *excludes* PA's and NP's, but it is sufficient for us to find that § 541.3(e) is ambiguous and to look to DOL's interpretive statements for additional guidance.

### C.

The DOL issued in 1949, and revised in 1973, an interpretive regulation (without notice and comment) regarding the meaning of the phrase "or any of its branches" in § 541.3(e):

Exception for physicians, lawyers, and teachers.

(a) . . . This exception applies only to the traditional professions of law, medicine, and teaching and not to employees in related professions which merely serve these professions.

(b) In the case of medicine:

(1) The exception applies to physicians and other practitioners licensed and practicing in the field of medical science and healing or any of the medical specialties practiced by physicians or practitioners. The term physicians means medical doctors including general practitioners and specialists, and osteopathic physicians (doctors of osteopathy). Other practitioners in the field of medical science and healing may include podiatrists (sometimes called chiropodists), dentists (doctors of dental medicine), optometrists (doctors of optometry or bachelors of science in optometry).

(2) [Section excepting interns and residents from salary-basis test omitted]

(3) In the case of medical occupations, the exception from the salary or fee requirement does not apply to pharmacists, nurses, therapists, technologists, sanitarians, dietitians, social workers, psychologists, psychometrists, or other professions which service the medical profession.

29 C.F.R. § 541.314(a), (b)(1)-(3) (1973). Because neither PA's nor NP's are specifically mentioned, we must ask whether, under § 541.314, plaintiffs are members of the "traditional profession[] of . . . medicine" or "related professions which merely service the [medical] profession."

EmCare reasons that the language of § 541.314(b)(1) is intentionally broad, and EmCare reiterates that anyone who holds a license and practices in a medical field qualifies for the salary-basis exception. In *Clark*, the court concluded that veterinarians are "other practitioners" within the meaning of § 541.314(b)(1), because the DOL did not intend the list provided to be exhaustive and because vets practiced "in the field of medical science and healing," albeit on animals. *Clark*, 390 F.3d at 1127. Plaintiffs point out, however, that the *Clark* court supported its interpretation by citing the DOL's Occupational Outlook Handbook, which lists as "Related Professions" to veterinarians "chiropractors, dentists, optometrists, physicians and surgeons, and podiatrists" but does not list any of these fields as

---

[25] *See, e.g.*, 29 C.F.R. § 541.314(b)(3) (1973); *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1061 n.1 (2d Cir. 1988) (holding that § 541.3(e) does not apply to nurses); *Harrison v. Washington Hosp. Ctr.*, 1979 WL 1923, at *2-*3 (D.D.C. 1979) (same).

"Related Professions" to NP's and PA's.[26]

Plaintiffs rely on the words "traditional professions of law, medicine, and teaching" to argue that NP's and PA's cannot possibly fall within the scope of § 541.314(b)(1) because these professions developed only in the mid-1960's and therefore did not exist in 1949 and could hardly have been traditional in 1973.[27] EmCare predictably replies that job duties, not job titles, should control who qualifies as a traditional practitioner,[28] and because PA's and NP's perform many of the traditional *duties* of physicians, they should qualify under the broad language of § 541.314(b)(1).

The best textual argument drawn from § 541.314(b) is that subheading (3) specifically excludes NP's from the salary-basis exception under the general category of "nurses." The DOL has repeatedly categorized NP's under the heading of "Registered Nurses" and has noted

than an NP is a nurse with advanced academic or clinical training.[29] Plaintiffs also point out that PA's and NP's are not "physicians, lawyers, [or] teachers" as indicated in the title of § 541.314. In sum, though the text of § 541.-314 alone does not suffice to reveal entirely the agency's position on this issue, plaintiffs' case gains some traction from straightforward textual analysis.

The parties next turn to the history of § 541.314(b). Plaintiffs emphasize in particular that the DOL has resisted efforts to expand the salary-basis exception several times since its inception, rejecting a proposal in 1949 to include "architects, engineers, and librarians" and specifically excluding pharmacists and nurses. The official report on the 1949 proposals stated, as the reason for keeping the salary-basis exception limited to lawyers and doctors, the following: "the traditional standing of these professions, the recognition of doctors and lawyers as quasi-public officials, [] the universal requirement of licensing by the various jurisdictions[, and the] relatively simple problems of classification presented by these professions." U.S. DEP'T OF LABOR, REPORT AND RECOMMENDATIONS ON THE PROPOSED REVISIONS OF REGULATIONS, PART 541, 77 (1949).

EmCare maintains that the history poses no obstacle to its position, because unlike architects, engineers, and librarians (at least historically), NP's and PA's require a license to practice, and unlike nurses and pharmacists, NP's and PA's help develop treatment plans for pa-

---

[26] *See id*; BUREAU OF LABOR STATISTICS, U.S. DEP'T OF LABOR, OCCUPATIONAL OUTLOOK HANDBOOK, *supra* notes 3 and 4. Although *Clark* cites the 2000 Handbook, the current version includes, *inter alia*, "physicians and surgeons" as "Related Occupations" for Registered Nurse. *See supra* note 4.

[27] *See* Elizabeth Harrison Hadley, *Nurses and Prescriptive Authority: A Legal and Economic Analysis*, 15 AM. J.L. & MED. 245, 268 n.104 (1989) (noting that the first training programs for NP's and PA's arose in the 1960's).

[28] To that end, EmCare notes that other practitioners with similarly limited responsibilities also qualify for the salary-basis exception under § 541.314; these include optometrists, who often cannot write prescriptions or perform eye surgery, and interns and residents, who must work under a physician's supervision.

[29] BUREAU OF LABOR STATISTICS, U.S. DEP'T OF LABOR, OCCUPATIONAL OUTLOOK HANDBOOK, *supra* note 4 (including NP's under "Registered Nurses" heading and listing NP as an "advanced practice nursing specialt[y]").

tients. Hence, Emcare represents that nowhere in the history does the DOL ever exclude a "practitioner" (as EmCare defines that term) of medical science or healing.

The parties also reference the 2004 amendments to the DOL regulations as persuasive authority. The amendments effectively adopted § 541.314 after notice and comment, without substantive change,[30] thereby tending to show that the text of § 541.3(e) does not contradict the former § 541.314. EmCare notes that the new regulations specifically list PA's alongside nurses and technologists as "learned professionals" who satisfy the duty requirements for the professional exemption, *id.* at § 301-(e)(4), but does not include PA's among nurses and technologists in the list of professions that fall outside the salary-basis exception, *id.* at § 541.600(e). Though this observation alone is insufficient to show that EmCare should prevail, it does support EmCare's case somewhat.[31]

Plaintiffs and the district court also noted a statistical chart in the 2004 rule's preamble that shows that 53,420 hourly paid PA's and 34,053 salaried PA's are subject to the salary-basis test; no physicians, dentists, or optometrists, however, are subject to it. The court reasoned that because the DOL had not changed the substance of the 1973 rule in 2004, the salary-basis exception included PA's both before and after the revisions. *See Belt*, 351 F. Supp. 2d at 632-33. EmCare contends that we cannot consider the preamble because it is not a "sufficiently clear" indication of the agency's intent to bind itself to the underlying policy, *see Kennecott Utah Copper Corp. v. United States Dep't of Interior*, 88 F.3d 1191, 1223 (D.C. Cir. 1996), and because the *Clark* court determined that veterinarians fall within the salary-basis exception even though the preamble also lists 1,037 hourly-paid vets and 16,267 salaried vets as subject to the salary-basis test.[32]

The most specific DOL interpretive statements on point include a 1974 DOL opinion letter and 1994 Field Operations Handbook (which contains almost identical language to the opinion letter) that state that PA's need to be compensated on a salary basis to qualify for the Professional Exemption.[33] EmCare does not dispute the meaning of the letter and Handbook but repeats its position that we should not consider agency interpretations in light of the fact that the 1973 regulation, § 541.3(e), is unambiguous; EmCare also questions the thoroughness with which the

---

[30] *See* 29 C.F.R. § 541.304. The DOL noted that it had "received few comments on this provision and does not believe any substantive changes are necessary in light of those comments." 69 Fed. Reg. 22,122, 22,158 (Apr. 23, 2004).

[31] The district court's reliance on this point to support plaintiffs' position seems an unnatural inference. The court basically reasoned that because all three professions are expressly mentioned in the duty section, all three should also be excluded from the salary-basis exception, even though that section mentions only nurses and technologists. *See Belt*, 351 F. Supp. 2d at 632.

[32] Also, EmCare notes that no NP's are listed as covered by the salary-basis test; therefore, we should assume that they, like physicians, fall within the salary-basis exception.

[33] WAGE AND HOUR DIV., U.S. DEP'T OF LABOR, FIELD OPERATIONS HANDBOOK § 22d23 (1994), *available at* http://www.dol.gov/esa/whd-/FOH/FOH_Ch22.pdf (stating that, to qualify, the PA must be "compensated for his or her services on a salary basis of not less than $250 a week, exclusive of board, lodging, or other facilities").

13

agency considered its position in the letter. Finally, the DOL's *amicus* brief unambiguously adopts the position that NP's and PA's do not qualify for the professional exemption.

### D.

The DOL's interpretive statements come to this court in a wide variety of formats, and we must decide what weight to give them under our precedents. We conclude that *Auer* applies, so we give controlling weight to the DOL's position adopted in the 1974 opinion letter, 1994 Handbook, and *amicus* brief, excluding PA's (and by extension, NP's) from the professional exemption to the FLSA overtime rules.

In *Auer*, the Court found that the Secretary's *amicus* brief sufficed to show how the DOL interpreted its own ambiguous regulation: The brief "is in no sense a '*post-hoc* rationalization' advanced by an agency seeking to defend past agency action against attack. There is simply no reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question." *Auer*, 519 U.S. at 462.

Similarly, there is no reason here to doubt the good faith of the Secretary's position, as *amicus*, that NP's and PA's must satisfy the salary-basis test. In particular, the position is consistent with the department's 1974 opinion letter (written one year after interpretive regulation § 541.314) and 1994 Handbook, which explicitly subject PA's to the salary-basis test, and the DOL's classification of NP's as a subset of registered nurse in its Occupational Outlook guide. Also, the history of the exception suggests that the agency intended to limit its reach to traditional medical practitioners, and state licensing regimes appear to mirror this approach. Although it seems beyond question that NP's and PA's assume many of the tradi-

tional duties of doctors, the language of § 541.3(e) "comfortably bears the meaning the Secretary assigns." *Id.* at 461.

Our decision in *Moore* does not require a contrary result. There we noted that "[*Chevron*] deference is not appropriate for an interpretation of a regulation found in an *amicus curiae* brief."[34] We recognized, 317 F.3d at 494, however, that the Court in *Auer* had given controlling weight to an *amicus* brief, and we correctly concluded that the critical question after *Christensen*, in deciding when to defer to informal interpretations of agency rules, is whether the underlying regulation is ambiguous.

We did not have occasion to defer to the Secretary's position as *amicus* in *Moore*, because the agency rule was plain. *See id.* at 497. Because, however, we decide that § 541.3(e) is ambiguous, we give controlling weight to the DOL opinion letter, Handbook, and *amicus* brief under *Auer*§§more than the mere respect required by *Skidmore*.[35]

---

[34] *Moore*, 317 F.3d at 494; *see also Christensen*, 529 U.S. at 587 (stating that "interpretations contained in formats such as opinion letters are 'entitled to respect' under our decision in *Skidmore*[], but only to the extent that those interpretations have the 'power to persuade[.]'").

[35] We leave intact our observation in *Moore* that *Chevron* deference is inappropriate for informal agency interpretations, such as opinion letters and *amicuscuriae* briefs. *See Moore*, 317 F.3d at 494. The most important reason for extending greater deference to an *amicus* brief that purports to interpret an agency's own ambiguous regulation (under *Auer*), than a brief that interprets the organic statute directly (under *Chevron*), is the greater expertise and familiarity of the agency with

(continued...)

14

EmCare's basic position is that it is possible to attribute a sufficiently clear scope to general language such as "practice . . . medicine or any of [its] branches" to allow a court to decide whether a particular person falls within its ambit. Though courts often find broad language unambiguous,[36] this case presents mixed evidence of ordinary meaning, particularly in the conflict between the strict definition of medical practice used by the Medical Practices Acts and EmCare's more generous definition, derived from common usage. Whether, in the abstract, NP's and PA's "practice medicine" presents a close question of classification, akin to distinguishing among the Platonic Forms, but it is one that we need not reach. As explained in *Ehlert v. United States*, 402 U.S. 99, 105 (1971),

> [w]e need not take sides in the somewhat theological debates . . . that the phrasing of this regulation has forced upon so many federal courts. Rather, since the meaning of the language is not free from doubt, we are obligated to regard as controlling a reasonable,

consistently applied administrative interpretation if the Government's be such.

Because the language of § 541.3(e) is not "free from doubt," and in view of the fact that the Secretary's position finds support in past practice and is not "plainly erroneous or inconsistent with the regulation," *Auer*, 519 U.S. at 461, deference is appropriate.

## IV.

Congress has entrusted the DOL with the task of defining who is eligible for the professional exemption to the FLSA. The agency has determined that a necessary indicator of professional status in most cases is salaried compensation, with the limited exception of the traditionalSSi.e., well-established and easily identifiableSSprofessions of law, medicine, and teaching. Absent a plain statement in a formal rule that NP's and PA's fall within this exception, the courts must choose between deciding the question *de novo* and deferring to the agency's less formal, but more specific, interpretive statements.

*Auer* counsels that deference better accords with Congress's intent and the agency's comparative expertise. Not only is the agency in a better position to determine when a salary is necessary to identify a professional: the agency is also better placed to make the calibrated policy judgment that PA's and NP's, despite higher barriers to entry and the increasing sophistication of their practice, are nascent professions in need of the FLSA's protection against the threat of "the evil of overwork as well as underpay."[37]

The summary judgment is AFFIRMED, and

---

[35](...continued)
respect to the history and content of its own enacted rules. *See* John F. Manning, *Constitutional Structure and Judicial Deference to Agency Interpretations of Agency Rules*, 96 COLUM. L. REV. 612, 630-31 (1999). *But see id.* at 618 (concluding that, "by providing the agency an incentive to promulgate imprecise and vague rules, [*Auer*-type deference] undercuts important deliberative process objectives of the APA, and it creates potential problems of inadequate notice and arbitrariness in the enforcement of agency rules.").

[36] *See, e.g.*, *MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218 (1994) (finding that the ordinary meaning of "modify" unambiguously precluded the FCC's interpretation under the Communications Act).

---

[37] 81 CONG. REC. 4983 (1937) (message of President Roosevelt).

this matter is REMANDED for further proceedings.