# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 4, 2011

Lyle W. Cayce
Clerk

No. 10-60324

THE PORT OF SHREVEPORT-BOSSIER,

Petitioner

v.

FEDERAL RAILROAD ADMINISTRATION,

Respondent.

PETITION FOR REVIEW OF ADMINISTRATIVE ORDER OF
THE FEDERAL RAILROAD ADMINISTRATION

Before BARKSDALE, CLEMENT, and PRADO, Circuit Judges.

PER CURIAM:[*]

The Federal Railroad Administration ("FRA") is statutorily charged by Congress to "prescribe regulations and issue orders for every area of railroad safety." 49 U.S.C. § 20103(a). The FRA has stated that its regulations do not apply to "plant railroads."  The Port of Shreveport-Bossier ("Port") petitions for review of the FRA's final action determining that the Port's railroad operations do not qualify as a "plant railroad" because the Port uses its railroad to move

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 10-60324

goods for its tenants. Because the FRA's interpretation of its regulatory exclusions is not plainly erroneous or inconsistent with FRA regulations, we **DENY** the Port's petition.

## FACTS

The Port was created in 1962 by an act of the Louisiana legislature and began operations in 1995. It owns approximately twenty-two miles of railroad track on approximately 2,000 acres of land. It currently operates three switch engines over ten to twelve miles of its track, all of which are on Port property.

The Port leases space on its property to fourteen tenants and provides railroad switching services to those tenants using its three locomotive engines. The Union Pacific Railroad Company ("UP") serves the Port by interchanging rail cars on designated "siding" tracks on Port property. After the UP has delivered a rail car, the Port picks up the car and delivers it to the appropriate tenant. Likewise, when a tenant wishes to send out a rail car, the Port delivers the car to the siding tracks, at which point the UP pulls the car off the Port's property and onto its track. The Port's tenants handle a variety of products, including automotive chemicals and fertilizer.

The Port and the FRA have been involved in a dispute over the FRA's safety jurisdiction over the Port's rail operations since 2002. A railroad operator subject to the FRA's jurisdiction is responsible for complying with FRA safety regulations. Before 2002, the FRA had not exercised jurisdiction over the Port, but in that year, the FRA's Office of the Chief Counsel determined that the Port would be subject to the FRA's jurisdiction. A multi-year discussion ensued, with the Port repeatedly contending that it was excluded from the FRA's regulations because it was a "plant railroad," and the FRA repeatedly asserting that the Port was required to follow FRA regulations. In 2007 and 2008, pursuant to its assertion that it had jurisdiction over the Port, the FRA performed inspections

No. 10-60324

at the Port and assessed civil penalties against the Port for violating various FRA safety regulations.

In 2010, the FRA issued a "final jurisdiction determination" letter to the Port asserting safety jurisdiction over the Port's railroad. The letter noted that Congress had given the FRA statutory jurisdiction over all railroad carriers but that, as a matter of policy, it did not regulate the full universe of railroads. The letter further explained that:

> FRA's regulations exclude from their reach railroads whose entire operations are confined to an industrial installation that is not part of the general system ("plant railroads"). Traditionally, FRA has excluded from its jurisdiction only those plant railroad operations that served the plant itself. A typical example would be a chemical plant that owns or leases a locomotive, uses that locomotive to switch cars throughout the plant, and is moving goods for use in the plant's own industrial processes.

The FRA stated its position that "once a railroad serves more than itself, it cannot be considered a plant railroad excepted from FRA's jurisdiction because it is operating on the general system and therefore becomes a general system railroad subject to FRA's authority." Because the Port switched rail cars for its fourteen tenants, the FRA concluded that the "plant railroad" exception did not apply, and thus, the Port's railroad was subject to FRA safety regulations. The Port timely filed a petition for review of the FRA's determination in this court under 28 U.S.C. § 2344. The 2007 and 2008 civil penalty cases have been held in abeyance pending this case.

## STANDARD OF REVIEW

This court employs a two-step test in interpreting an agency regulation. First, we ask whether the regulation is "ambigu[ous] with respect to the specific question considered." *Belt v. EmCare, Inc.*, 444 F.3d 403, 408 (5th Cir. 2006) (alteration in original) (citation omitted). Second, if the regulation is ambiguous, the agency's interpretation is "controlling unless plainly erroneous or

3

inconsistent with the regulation." *Id*. (citation omitted). "If the regulation is unambiguous, we may still consider agency interpretation, but only according to its persuasive power." *Id*.

## DISCUSSION

The question before the court is whether the "plant railroad" exceptions to FRA safety regulations exclude a railroad located inside an industrial installation, where the railroad serves entities other than the installation owner. Although the FRA and the Port describe a single "plant railroad exception" in their briefs, there is no single regulatory exception covering all FRA safety regulations. Instead, with some minor differences in phraseology, most FRA safety regulations contain language excluding railroads that operate "only on track inside an installation which is not part of the general railroad system of transportation." *See, e.g.*, 49 C.F.R. §§ 225.3(a)(1); 232.3(c)(1); *see also* 49 C.F.R. pt. 209 app. A (explaining the FRA's interpretation that the exceptions apply to "plant railroads").

The first step in the *Belt* test is to determine if the regulations are ambiguous with respect to this issue. *Belt*, 444 F.3d at 408. The regulations do not define when a railroad operating inside an installation is part of the "general railroad system of transportation." We therefore conclude that the regulations are ambiguous as to whether the Port's railroad is excluded from FRA regulations.

The second *Belt* step asks whether the FRA's determination is "plainly erroneous or inconsistent with the regulation[s]." *Id*. An agency can interpret its own regulations through opinion letters and policy statements. *See Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000). The FRA has previously issued a policy statement that the plant railroad exceptions apply to "railroads whose entire operations are confined to an industrial installation." 49 C.F.R. pt. 209 app. A. These railroads are not on the "general railroad system of

transportation" even if they are connected to the general system and can deliver goods. *Id.* The plant railroad exceptions also apply to leased railroad track outside the plant if the exclusive use of the trackage is for "moving only cars shipped to or from the plant." *Id.* However, a plant railroad that moves "cars on [the outside] trackage for other than its own purposes (e.g., moving cars to neighboring industries for hire)" would not fall under the plant railroad exceptions because it would be back in the "general system." *Id.*

> In this case, the FRA determination letter to the Port stated that:

> Here, the Port is not receiving rail shipments for use in any industrial process of its own, but is instead switching rail cars for fourteen different tenants. As a result, the Port's rail operations bring the Port's track into the general system . . . .

> Because of the Port's role in interstate commerce on the general system, the Port cannot be considered a plant railroad excepted from the application of FRA's safety regulations.

Thus, the FRA interprets its regulations excluding a railroad operating on track "inside an installation which is not a part of the general railroad system of transportation" to exclude a railroad on track in an industrial installation *only* if the plant railroad moves cars for the installation's own purposes. The Port undisputedly moves cars on its railroad tracks for its tenants, and thus does not fall under the FRA's interpretation of the "plant railroad" exceptions.

The Port presents no argument as to why the FRA's interpretation is an incorrect reading of the phrase "track inside an installation which is not part of the general railroad system of transportation." Instead, the Port argues that the FRA's determination letter is contrary to 49 C.F.R. pt. 209 Appendix A's statement that the "plant railroad" exceptions apply to "railroads whose entire operations are confined to an industrial installation."[1] But the Port ignores

---

[1] The Port erroneously argues that Appendix A is itself a regulation that unambiguously excludes the Port from the FRA's jurisdiction. We have stated that "regulations, substantive rules or legislative rules are those which create law, usually

Appendix A's other statement that a plant "moving cars on [its outside] trackage for other than its own purposes" for hire is in the "general system of transportation" and subject to FRA regulations. *Id*. The FRA's determination letter extends this concept to trackage that is inside the confines of the industrial installation.[2]   Furthermore, the FRA correctly notes that a "plant railroad" is commonly understood to be a rail operation servicing the owner's manufacturing plant, not other entities.[3]   *See Lone Star Steel Co. v. McGee*, 380 F.2d 640, 648 (5th Cir. 1967) (holding that company's railway was a "common carrier" and not an in-plant rail system under Federal Employer's Liability Act because it had "adopted the regular practice of transporting for others"); 49 C.F.R. pt. 209 app. A (describing plant railroads as belonging to industrial installations "such as those in steel mills that do not go beyond the plant's boundaries"). The FRA's determination letter is consistent with its previous interpretation and is not "plainly erroneous" or "inconsistent" with the

_____

implementary to an existing law; whereas interpretative rules are statements as to what the administrative officer thinks the statute or regulation means." *Brown Express, Inc. v. United States*, 607 F.2d 695, 700 (5th Cir. 1979) (quoting *Gibson Wine Co. v. Snyder*, 194 F.2d 329, 331 (D.C. Cir. 1952)) (internal quotation marks omitted). Appendix A, a "Statement of Agency Policy Concerning Enforcement of the Federal Railroad Safety Laws," is an interpretive rule because it describes what the FRA thinks the individual exceptions in 49 C.F.R. §§ 209-244 mean. *See* 49 C.F.R. pt. 209 app. A ("For example, all of FRA's regulations exclude . . . ."). Thus, the correct comparison is whether the FRA's determination is plainly erroneous or inconsistent with the exceptions in 49 C.F.R. §§ 209-44.

[2]   The Port argues in one sentence, without citing any authority, that the FRA's determination letter was a "change in the meaning of the regulations" requiring formal rulemaking. By failing to adequately brief this argument, the Port has waived it. *L & A Contracting Co. v. S. Concrete Servs., Inc.*, 17 F.3d 106, 113 (5th Cir. 1994).

[3]   The Port also argues (1) that there is no distinction between its rail operation and an in-plant railroad serving only an industrial plant and (2) that FRA safety regulations are unduly burdensome for an operation of its size. The Port's arguments have considerable force, but as described above, we are bound to give substantial deference to an agency's interpretation of its own regulations. As the FRA noted in its briefing with even greater emphasis at oral argument, the Port remains free to apply for a waiver of FRA regulations. The FRA may grant a waiver "if the waiver is in the public interest and consistent with railroad safety." 49 U.S.C. § 20103(d).

exceptions in 49 C.F.R. §§ 209-244. We therefore **DENY** the Port's petition for review of the FRA's determination letter.